**UNITED STATES DISTRICT COURT
DISTRICT OF MAINE**

| | | |
|---|---|---|
| MR. AND MRS. R., *Individually and as* | ) | |
| *Parents and Next Friends of A.R., a Minor,* | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| *v.* | ) | *No. 2:18-cv-00047-LEW* |
| | ) | |
| *YORK SCHOOL DEPARTMENT,* | ) | |
| | ) | |
| *Defendant* | ) | |

**RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and its state-law analogue, 20-A M.R.S.A. § 7001 *et seq.*, plaintiffs Mr. and Mrs. R., the parents of student A.R. ("Parents"), challenge rulings by a Maine Department of Education hearing officer ("Hearing Officer") that defendant York School Department ("York") offered A.R. an appropriate individualized education program ("IEP") and public school placement for his fifth- and sixth-grade school years, as a result of which they are not entitled to reimbursement from York of the cost of their unilateral placement of A.R. at the Landmark School ("Landmark"), a special-purpose private school in Manchester-by-the-Sea, Massachusetts. *See* Complaint (ECF No. 1) ¶¶ 1-2, 7, 36, 53; Plaintiffs' Memorandum of Law ("Parents' Brief") (ECF No. 15) at 1, 18-35. York defends its IEP offers and placements for both years. *See* Defendant York School Department's Memorandum of Law ("York's Response") (ECF No. 21) at 1-2.

After careful review of the administrative record, and with the benefit of oral argument held before me, I recommend that the court adopt the following findings of fact and conclusions of law and deny the Parents' request for relief.

1

# I.  Applicable Legal Standards

## A.  IDEA

1.      The IDEA is a "comprehensive statutory scheme" that Congress enacted to ensure that all children with disabilities are accorded a free appropriate public education ("FAPE") and that both their rights and those of their parents are protected.  20 U.S.C. § 1400(d)(1)(A)-(B); *Frazier v. Fairhaven Sch. Comm.,* 276 F.3d 52, 58 (1st Cir. 2002).

2.      As a condition for receiving federal funds, states are required to provide a FAPE to all disabled children.  *See, e.g., Lessard v. Wilton-Lyndeborough Coop. Sch. Dist.,* 518 F.3d 18, 23 (1st Cir. 2008).  In order to provide a FAPE, a school must create and then follow an IEP for each disabled child.  *D.B. ex rel. Elizabeth B. v. Esposito,* 675 F.3d 26, 34 (1st Cir. 2012).  The IEP is "a written statement for each child with a disability that is developed, reviewed, and revised" in accordance with the IDEA and must include, among other things, the following: a statement of the child's present levels of academic achievement and functional performance; a statement of measurable annual goals; criteria for measuring progress toward those goals; and a statement of the specific services that the school will offer.  20 U.S.C. § 1414(d)(1)(A).

3.      The IDEA imposes additional procedural and substantive requirements with regard to the IEP.  *See, e.g., Roland M. v. Concord Sch. Comm.,* 910 F.2d 983, 987-88 (1st Cir. 1990). For example, parents have the right to be part of the IEP "team" along with teachers and other educational professionals charged with formulating a child's particular IEP.  20 U.S.C. § 1414(d)(1)(B); *Lessard,* 518 F.3d at 23.  The purpose of such procedural safeguards is to "guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." *Pihl v. Mass. Dep't of Educ.,* 9 F.3d 184, 187 (1st Cir. 1993) (citation and internal quotation marks omitted).  "To meet its substantive obligation under the IDEA, a school must offer an IEP

reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex. rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017); *Johnson v. Boston Pub. Schs.*, 906 F.3d 182, 194 (1st Cir. 2018) (same).

4.      In the event of a dispute between the school and the child's parents regarding the IEP, the parents have the right to demand a hearing by an impartial hearing officer. *See, e.g.*, 20 U.S.C. § 1415(f)(1)(A), (B)(ii). A party dissatisfied with a hearing officer's decision may seek judicial review of that decision by a state court or a federal district court, which must (i) receive the records of the administrative proceedings; (ii) hear additional evidence at the request of a party; and (iii) grant relief as it deems appropriate based upon the preponderance of the evidence. *See, e.g., id.* § 1415(i)(2)(A), (C).

5.      A parent may challenge a hearing officer's IDEA decision regarding a school district's compliance with procedural requirements, substantive requirements, or both. *See, e.g., Bd. of Educ. v. Rowley,* 458 U.S. 176, 206-07 (1982). In this case, the Parents raise the second type of challenge.

6.      A court's authority to grant relief under the IDEA "includes the power to order school authorities to reimburse parents for their expenditures on private school education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *Pihl,* 9 F.3d at 188 (citation and internal quotation marks omitted).

**B.  Standard and Scope of Review**

7.      "District courts considering challenges to administrative IDEA decisions apply an intermediate standard of review that [the First Circuit has] called 'involved oversight.'" *Johnson*, 906 F.3d at 190-91 (citation omitted). Under that standard,

> [a] district court reviews the administrative record, which may be supplemented by additional evidence from the parties, and makes an independent ruling based on the preponderance of the evidence. However, that independence is tempered by the

requirement that the court give due weight to the hearing officer's findings.  As a result, a district court's review falls somewhere between the highly deferential clear-error standard and the non-deferential de novo standard.

*Id*. at 191 (citation and internal quotation marks omitted).

8.      The First Circuit and other courts have suggested that the level of deference due to the hearing officer's findings depends on whether the court is equally well-suited to make the determination despite its lack of educational expertise.  *See, e.g., Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004) ("Less weight is due to an agency's determinations on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation.  More weight, however, is due to an agency's determinations on matters for which educational expertise is relevant.") (citations and internal quotation marks omitted); *Abrahamson v. Hershman*, 701 F.2d 223, 231 (1st Cir. 1983) (noting that while it might be "inappropriate for a district court under the rubric of statutory construction to impose a particular educational methodology upon a state[,]" "for judicial review to have any meaning, beyond a mere review of state procedures, the courts must be free to construe term 'educational' [in the IDEA] so as to insure, at least, that the state IEP provides the hope of educational benefit").  Even as to findings of fact, the court retains the discretion, after careful consideration, "to accept or reject the findings in part or in whole."  *Town of Burlington v. Dep't of Educ.*, 736 F.2d 773, 792 (1st Cir. 1984), *aff'd* 471 U.S. 359 (1985).

9.      In IDEA cases, as in other contexts, the burden of persuasion rests on the party seeking relief.  *See, e.g., Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 51 (2005); *Me. Sch. Admin. Dist. No. 35 v. Mr. R.,* 176 F. Supp.2d 15, 23 (D. Me. 2001) (rec. dec., *aff'd* Feb, 27, 2002), *rev'd on other grounds*, 321 F.3d 9 (1st Cir. 2003), *called into doubt on other grounds*, *Boston Children's First v. City of Boston,* 395 F.3d 10, 15 (1st Cir. 2005) ("The party allegedly aggrieved

must carry the burden of proving . . . that the hearing officer's award was contrary to law or without factual support.").

## II. Proposed Findings of Fact

1.    This case involves A.R., now 13 years old, who resides with his parents, Mr. and Mrs. R., in York, Maine.  Complaint ¶ 8; Answer (ECF No. 9) ¶ 8; Testimony of [Mrs. R.] ("*Mrs. R.*"), Administrative Record ("R.") at 4409-10.[1]  A.R. attended York schools full-time from kindergarten until the Parents unilaterally enrolled him at Landmark in June 2016, following his fourth-grade year.  *Mrs. R.* at 4508, 4524-25.

### A. Kindergarten Through Third Grade

2.    As early as preschool, A.R. showed signs of a learning disability, *id.* at 4410-11, and York first identified him as a student eligible for special education services pursuant to the IDEA in June 2012, at the conclusion of his kindergarten year (2011-12), Complaint ¶ 12; Answer ¶ 12.  While a 2011 psychoeducational assessment revealed that A.R. had cognitive scores in the average to high-average range, R. at 141, 143, he had "difficulty recognizing letters in his name[,]" *id.* at 130.

3.    During first grade (2012-13) and second grade (2013-14), A.R. was provided with pull-out reading and math services, to which his IEP team added pull-out written language and social skills services in early 2013.  *Id.* at 197, 202, 215.  As of the end of first grade, A.R. continued to "struggle in the area of reading, even with the level of intensive services that have been given."  *Id.* at 256.  Increasingly concerned, the Parents hired reading consultant Victoria Papageorge, M.Ed., M.S., of Hyperion Learning Services ("Hyperion") in October 2013 to

---

[1] For ease of reference, I have cited to the consecutively numbered pages of the 24-volume administrative record rather than page numbers within specific documents.

perform an independent evaluation. *Id*. at 276. Ms. Papageorge determined that A.R. had a rare type of dual-processing deficit, with weaknesses in both phonological (auditory) and orthographic (visual) processing, "significantly impacting [his] development of basic reading skills." R. at 300; Testimony of Victoria Papageorge ("*Papageorge*"), R. at 4823, 4855. She observed A.R. to be "fragile and lacking self-confidence with his reading abilities, so that self-esteem has become an issue." R. at 302.

4.     Ms. Papageorge recommended that A.R. receive an "integrated reading program which will stimulate both the auditory (phonological awareness and phonological memory) and visual processing realms (orthography) in order to move forward in reading." *Id*. at 303. She specified the use of two research-based Lindamood-Bell reading intervention programs: LiPS to target A.R.'s phonological deficits, and Seeing Stars to target his orthographic deficits. *Id*. at 303-04. She noted that, "[d]ue to the severity of [A.R.'s] reading disability, he should receive direct reading instruction one-on-one with a highly qualified reading specialist or special education teacher trained in *Lindamood*[-]*Bell Processes* – 5 days a week/50 minutes." *Id*. at 304.

5.     With the benefit of the Papageorge evaluation, A.R.'s IEP team convened on December 17, 2013, to determine his IEP for the end of second grade and the beginning of third. *Id*. at 329.[2] The team agreed to categorize A.R. as a student with a Specific Learning Disability, *id*., and to provide him with 1:1 instruction in the LiPS and Seeing Stars programs for one hour and 45 minutes daily and social skills instruction for 90 minutes weekly, as well as providing 30 minutes weekly for his two special education teachers to meet and five hours annually for those teachers to consult with a reading specialist, *id*. at 338. The team determined that A.R. would be

---

[2] A.R.'s IEPs ran from the late fall of one grade to the late fall of the next; for example, the IEP developed on December 17, 2013, was effective as of December 18, 2013, with an annual review date of December 16, 2014. R. at 329.

with nondisabled children (that is, mainstreamed) 66 percent of the time. *Id.* at 340. York retained Ms. Papageorge to serve as A.R.'s reading consultant. *Id.* at 2528.

6.     Christine Peskurich, who had been A.R.'s special education teacher since first grade, provided his 1:1 Seeing Stars instruction, and Michael Aucoin, a York speech and language pathologist, provided his 1:1 LiPS instruction. Testimony of Christine Peskurich ("*Peskurich*"), R. at 5260, 5266, 5270-71. In summarizing her consultations with Ms. Peskurich and Mr. Aucoin during A.R.'s second-grade year, Ms. Papageorge noted that A.R. had made "nice gains" and that both teachers were "well qualified and extremely conscientious in learning this program and the most effective ways to integrate it so that [A.R.] will progress." R. at 2528-29. Testing performed in June 2014 indicated that A.R.'s Oral Reading Score Index and Total Word Reading Efficiency Index scores had increased since October 2013. *Id.* at 345. He was at grade equivalent 1.0 in oral reading rate, accuracy, and fluency, 1.2 in sight word efficiency, 1.5 in phonemic decoding efficiency, and 2.7 in comprehension. *Id.*

7.     During third grade (2014-15), A.R. again received Lindamood-Bell instruction from Ms. Peskurich and Mr. Aucoin. *Peskurich* at 5276-77. His IEP team met on December 16, 2014, for his annual review, increasing his specially designed 1:1 literacy instruction from 525 to 570 minutes weekly, reducing his social skills instruction from 90 to 30 minutes weekly given his significant improvement in that area, continuing the provision of 30 minutes of weekly consultation between his special education teachers and five hours annually between those teachers and a literacy consultant, and removing the reference in his IEP to LiPS and Seeing Stars curriculum alignment. R. at 2538-39, 2553-54. The team determined that A.R. would spend 67 percent of his time with nondisabled peers. *Id.* at 2554.

8.      In a June 2015 report, Ms. Papageorge recommended that A.R. continue to receive 1:1 instruction in LiPS and Seeing Stars and that Ms. Peskurich and Mr. Aucoin "integrat[e] the two programs in one time period, rather than [A.R.] receiving part of his lesson in the morning and the rest of the lesson in the afternoon." *Id*. at 397. York reported in June 2015 that A.R. was progressing toward reading at grade level, although he did not yet meet that standard. *Id*. at 777.

### B. Fourth Grade

9.      Early in A.R.'s fourth-grade year (2015-16), York informed the Parents that it had terminated Ms. Papageorge's consultation services and contracted with Sherri Beall, the owner of Exeter Speech, Language & Education Associates, to provide the five hours of consultation services specified in A.R.'s IEP. R. at 2198; Testimony of Melissa Camire ("*Camire*"), R. at 5335, 5430. The Parents strongly opposed this change. R. at 2198. Ms. Beall has a master's degree in education and two New Hampshire certifications, one in special education and one in specific learning disabilities. Testimony of Sherri Beall ("*Beall*"), R. at 5141-42. She has experience with LiPS and specializes in Precision Teaching, a systematic measurement system in which a student's progress is charted to guide instructional decisions. *Id*. at 5145-47.

10.     During fourth grade, A.R. attended mainstream science, social studies, and math classes. Testimony of Jessie Phillips Rafferty ("*Phillips Rafferty*"), R. at 5440. 5507. Jessie Phillips Rafferty was his general education teacher, and Ms. Peskurich took over instruction in the LiPS program from Mr. Aucoin, implementing all of A.R.'s 1:1 programming in one 60-minute block per day with weekly consultations from Ms. Beall, including in the provision of Precision Teaching. *Id*. at 5441; *Peskurich* at 5695; *Beall* at 5152. As of January 2016, Ms. Peskurich no longer provided daily Seeing Stars lessons, although she did continue to provide that instruction periodically. *Peskurich* at 5784.

11.     In the fall of 2015, staff observed A.R. exhibiting some work avoidance behavior, including during his literacy-heavy math class.  R. at 1996; *Phillips-Rafferty* at 5448-49. During a November 4, 2015, IEP team meeting, the team addressed this issue by amending A.R.'s IEP to add 30 minutes per day of in-class support in math by an educational technician.  R. at 2663.  York also offered social work services to address A.R.'s anxiety, but the Parents declined them because they felt that the source of his anxiety was his inability to read.  *Id*.  Ms. Phillips-Rafferty testified that, by late winter or early spring, the intervention of adding adult support was successful, enabling A.R. to access the regular math curriculum.  *Phillips-Rafferty* at 5450-01.

12.     For A.R.'s triennial evaluation, York contracted for testing in October 2015 by Lauren A. Cook, Ph.D., a neuropsychologist.  R. at 917, 933.  Dr. Cook diagnosed A.R. with a Specific Learning Disability in reading as well as attention deficit hyperactivity disorder and generalized anxiety disorder.  *Id*. at 927.  Noting his difficulties with phonological processing, limited automaticity with word recognition, and reduced fluency, *id*., she recommended the use of "evidence based reading program(s) that are systematic, comprehensive, and multi-sensory[,]" *id*. at 930.

13.     Dr. Cook recommended that A.R. have "a combination of separate and inclusive programming at this time[,]" describing "opportunities for inclusion [as] imperative for friendship development, feeling a part of the school community, and for improving the overall quality of life." *Id*. at 928.

14.     The IEP team reconvened on November 20, 2015, to develop an IEP for the end of fourth grade and the beginning of fifth grade.  *Id*. at 2702.  The Parents expressed concern that A.R. "still cannot read[,]" causing him anxiety and low self-esteem, and could not access the general curriculum despite his intellectual potential.  *Id*. at 2698.  The IEP team increased the

amount of consultation time between Ms. Beall and Ms. Peskurich to 20 hours per year to help Ms. Peskurich implement Precision Teaching, *id.*, and provided for 450 minutes per week of specially designed reading instruction and 180 minutes per week of specially designed written instruction, *id.* at 2715. The team determined that A.R.'s least restrictive environment was to spend 62 percent of his school day with non-disabled peers. *Id.* The IEP continued to provide an array of accommodations, including adult support for math class. *Id.* at 2713-15.

15. A.R.'s IEP team next met on February 9, 2016, at the request of the Parents, who had raised concerns regarding A.R.'s transition to fifth grade at York Middle School and York's hiring of a new director of special education who was unfamiliar with A.R.'s educational needs. *Id.* at 2720, 2724. The Parents expressed concern that A.R. "receive the same type and frequency of services" in fifth grade "as he is presently receiving; specifically, . . . 1:1 reading instruction using LiPS and Seeing Stars methodology with a teacher qualified to provide that instruction and with weekly progress monitoring by the same special education consultant[.]" *Id.* at 2720.

16. At the meeting, Ms. Beall reported that A.R. could read at third-grade level with guidance, with a goal to be reading independently at that level by the end of that school year. *Id.* at 2724-25. The IEP determined that A.R. would continue to have 1:1 specialized reading instruction for 450 minutes per week at middle school and 60 minutes per week of consultation with Ms. Beall. *Id.* at 2724. His IEP also continued to provide for 180 minutes per week of specialized written language instruction. *Id.* at 2736. Melissa Camire, York's special education director, *Camire* at 5336, informed the IEP team that Charlotte LeGolvan would be A.R.'s case manager in fifth grade, and "it was agreed that she would be the most qualified reading instructor"

to carry out A.R.'s program, R. at 2725.[3]  The team agreed to meet prior to the end of the school year "to review progress monitoring and review services[,]" *id.* at 2724, and to meet during the first week of fifth grade "to make sure that all parts of [A.R.'s] program will be implemented and review transition[,] *id.* at 2725.

17.     The Parents began to explore other options and, in April 2016, applied for A.R.'s admission to Landmark for fifth grade.  *Id.* at 809; *Mrs. R.* at 4507.

18.     At the Parents' request, Ms. Papageorge reevaluated A.R. in May 2016.  R. at 452. Ms. Papageorge's testing indicated that A.R. had a grade equivalency of 2.6 in word recognition, 2.9 in work attack, and 2.5 in basic skills.  *Id.* at 453.  She found that he "continue[d] to perform significantly below the average range at the 8th percentile for age, in acquisition of basic reading skills with significant scatter between the sight-word recognition and phonics development which were at the 5th and 14th percentiles, respectively."  *Id.*

19.     By letter dated May 25, 2016, Landmark accepted A.R.  *Id.* at 808.  The Parents did not accept the offer immediately because they wanted to know what York would propose for A.R.'s potential transition to fifth grade at York Middle School.  Testimony of [Mr. R.] ("*Mr. R.*"), R. at 5072, 5090.

20.     On June 6, 2016, A.R.'s IEP team met for the fourth time during his fourth-grade year.  R. at 483.  The Parents again raised concerns that "A.R.'s reading disability and poor fluency [were] prevent[ing] him from accessing the general curriculum" and that his inability to read was causing a "great deal of anxiety for him," which was likely to increase in the face of more rigorous

---

[3] Ms. LeGolvan has been a special education teacher for more than 30 years, has two master's degrees in education, and is a certified special education teacher and a certified literacy consultant in Maine.  Testimony of Charlotte LeGolvan ("*LeGolvan*"), R. at 5519-21.  Ms. LeGolvan is trained in LiPS and other reading programs such as Wilson. *Id.* at 5521-24.  She had also used Precision Teaching in her first teaching job.  *Id.* at 5535.  She was trained in Seeing Stars in June 2017.  *Id.* at 5522.

academic demands in middle school. *Id*. at 485. York reported that its testing had shown that A.R. was reading at an independent third-grade level. *Id*. at 483. York promised to provide the Parents with "two different possible [middle school] schedules for [A.R.] . . . before the end of the school year." *Id*.

21.     York issued an amended IEP that (i) carried over existing services and supports, including the provision of 450 minutes weekly of 1:1 reading instruction and 180 minutes weekly of 1:1 written language instruction and the accommodation of adult support in math class, *id*. at 1931-32, (ii) added an accommodation of "use of technology to access regular education curriculum text to speech and speech to text[,]" *id*. at 1931, and (iii) added a goal of the use of a universal graphic organizer across the curriculum, *id*. at 1928.

## C. Fifth Grade

22.     On June 17, 2016, Ms. LeGolvan emailed the Parents a proposed middle school schedule. *Id*. at 488. York proposed providing A.R.'s 1:1 reading instruction from 12:25 to 1:10 p.m. and his 1:1 writing instruction from 1:10 to 1:55 p.m. *Id*. Ms. LeGolvan explained that, pursuant to the middle school's "waterfall" class schedule, English language arts ("ELA"), social studies, science, math, and allied arts were all offered four times a week during periods one through four. *Id*. Therefore, A.R. would "need to miss one content area class completely and one other class, as well, in order for him to have 5 days of [1:1] instruction." *Id*. She suggested that he either skip science completely, plus one allied arts class, or skip four allied arts classes and one science class. *Id*. She explained, "It doesn't seem like a good choice to pull from English and/or Social Studies since they are integrated and will include York History field trips in which all 5th graders participate." *Id*. She added that "Language arts will be literature rich with a teacher who has strong literacy skills." *Id*.

23.    The Parents submitted a signed agreement to Landmark on June 23, 2016, *id*. at 2321-24, and provided written notice to York of their unilateral placement on August 17, 2016, *id*. at 496-97.  By August 2016, Ms. LeGolvan had begun preparing to instruct A.R. during his fifth-grade year.  *LeGolvan* at 5530.  She had observed A.R. in his spring class with Ms. Peskurich and twice observed him in his summer program with Ms. Beall.  *Id*. at 5530-31.  She had also requested additional training time with Ms. Beall to become more familiar with lesson planning and charting, stating that she had been trained in Lindamood-Bell but had not used it and needed to practice it to get up to speed.  *Id*. at 2128-29.  However, on August 17, 2016, Ms. Beall apprised Ms. LeGolvan that Erin Frazier, who had succeeded Ms. Camire as York's director of special education, had informed her earlier that week that "she was unable to commit to that right now." R. 2130; Testimony of Erin Frazier ("*Frazier*"), R. at 5583, 5592-95.

24.    Ms. LeGolvan understood that she would be providing LiPS, Precision Teaching, and Seeing Stars instruction to A.R., but she had not yet been trained in Seeing Stars as of August 2016.  *LeGolvan* at 5529, 5567.  She testified that the manuals of Lindamood-Bell are "well laid out" and that Seeing Stars "is probably the one program that you can pick up pretty quickly[.]"  *Id*. at 5567.

25.    For fifth grade (2016-17), A.R. attended Landmark as a day student.  *Mrs. R*. at 4528.  Landmark is a private school specializing in instructing students with dyslexia and language-based learning disabilities.  R. at 2298.  It provides a "non-graded, intensive remedial program" in 1:1 tutorials and small classes of no more than eight students.  *Id*. at 2308.  All Landmark instruction is "language-based, meaning specific strategies and techniques that emphasize and reinforce listening, reading, speaking, and writing are integrated into every area of the curriculum."  *Id*.  The focus is on limiting the use of technology as a bypass strategy so that

students must learn and master the basic literacy skills of reading and writing.  *Id.* at 2315 ("Philosophically, we have found bypass techniques unnecessary or, at worst, in conflict with our program and structure[.]").

26.     A.R.'s fifth-grade schedule at Landmark included small group classes in all academic areas, including social studies, mathematics, and science.  *Id.* at 686.  He received 1:1 direct literacy instruction in a language arts tutorial for 45 minutes a day, or 225 minutes per week. Testimony of Karl Pulkkinen ("*Pulkkinen*"), R. at 4730, 4788-89.  For literacy instruction, Landmark used Let's Read, Read Naturally, and materials from the LiPS program.  R. at 2889, 2904.  It did not provide A.R. the Seeing Stars program.  *Pulkkinen* at 4802.

27.     Michael Cunha, the tutor assigned to provide literacy instruction to A.R. beginning in January 2017, had a bachelor's degree in history and no master's degree.  *Id.* at 4796, 4798.  His only prior educational experience was two years of work as an instructional aide to children with autism and social, emotional, and behavioral difficulties.  *Id.* at 4798.  Mr. Cunha received his first certification as a special education teacher through a waiver a month before he began working with A.R.  *Id.* at 4800-01.  As of January 2017, Mr. Cunha had just finished his LiPS training.  *Id.* at 4797, 4799.  He was not trained in Seeing Stars.  *Id.* at 4799.[4]

28.     York convened A.R.'s annual IEP team meeting on November 17, 2016.  R. at 600. The Parents attended the meeting with their advocate, attorney Mary Stevens.  *Id.* at 577; Testimony of Mary Stevens ("*Stevens*"), R. at 4692-93, 4725-26.  Mr. R. described A.R. as "much

---

[4] At the due process hearing, Ms. Papageorge testified that, for a program for A.R. to be appropriate, it would need to include Seeing Stars to address his significant orthographic processing deficits.  *Papageorge* at 4928.  She testified that, "as far as I know," the only training that Lindamood-Bell offers for Seeing Stars is a two-day training.  *Id.* at 5019.  However, she testified that "it takes a good year to learn that program . . . and you need to have a strong reading background because if you don't, you can't help – you can't teach children how to self-correct where there are errors." *Id.* at 5020-21.

happier and [more] confident" at Landmark.  R. at 602.  The IEP team amended A.R.'s IEP to provide for 225 minutes per week of 1:1 reading instruction, *id*. at 601, the same amount of  1:1 specially-designed instruction that he was receiving at Landmark, *Pulkkinen* at 4788-89.[5]  As of that time, the Parents had no intention of pulling A.R. out of Landmark.  *Mrs. R*. at 4623.  Attorney Stevens did not object to any of the changes made at the IEP team meeting or later challenge them in writing.  *Stevens* at 4726.

29.     On April 4, 2017, the Parents requested a due process hearing, raising for the first time concerns about the IEP developed at the November 17, 2016, IEP team meeting.  *Frazier* at 5822.  The Parents declined to attend a resolution session, stating that they did not think it would add anything to the IEP team meeting.  R. at 2990.  York scheduled a resolution session for April 21, 2017, and invited the Parents, who responded that they were unable to attend.  *Id*. at 2991-92. At the resolution session, the IEP team members present, Ms. Peskurich and Ms. Frazier, reinstated 450 minutes per week of specialized reading instruction, in addition to providing for 180 minutes per week of specialized writing instruction, but did not include 1:1 support in mainstream classes among the list of his accommodations.  R. at 2827-28.  They stated that they had "considered supporting [A.R.] with one to one adult support in his science and social studies class, but currently there is no data to support the need for this level of service."  *Id*. at 2829.  Ms. Frazier testified at the due process hearing that, while 1:1 support was not included in A.R.'s IEP, support from educational technicians was generally available to all students, and there was "frequently an additional adult available."  *Frazier* at 5859.

30.     Following the resolution session, York scheduled a May 24, 2017, IEP team meeting to consider documentation that it had received from Landmark.  R. at 2839.  The Parents

---

[5] The Hearing Officer incorrectly stated that the IEP developed on November 17, 2016, offered 450 minutes of reading instruction and 180 minutes of writing instruction per week.  Finding 58, R. at 4381.

attended with Attorney Stevens, and Landmark staff participated by phone. *Id*. at 2889. Attorney Stevens indicated that the Parents' "main concern all along, really, since [the IEP team] met last year around this time, is how [the IEP] will be implemented in York Middle School[.]" *Id*. at 2928. She elaborated, "The question is not so much with . . . the goals and with what's written here, it's . . . what does this mean for his day," including "who's going to be doing it and . . . what's his schedule going to look like." *Id*. at 2936.

31. York again amended A.R.'s IEP on June 30, 2017, for the period through the date of his next annual IEP team meeting on November 16, 2017. *Id*. at 728. The IEP, as amended, provided for 450 minutes of specialized reading instruction and 180 minutes of specialized writing instruction per week (with no specification of the programs to be delivered), 30 minutes per week of executive function coaching, 45 minutes per week of social work services, and 20 hours per year of consultation with a reading specialist. *Id*. at 754. The IEP provided a number of accommodations, including the use of speech-to-text and text-to-speech technology, but did not provide for 1:1 adult support in mainstream classes. *Id*. at 749-53.

32. According to Landmark's data, A.R. was reading at level 3.5 in his Reads Naturally program in June of his fifth-grade year. *Pulkkinen* at 4813-14. Mr. Pulkkinen described his progress at Landmark as appropriate but "uneven at best." *Id*. at 4815.

33. At the Parents' request, Ms. Papageorge also observed A.R. at Landmark in the spring of 2017 and reevaluated him in June and July 2017. *Id*. at 2382-83. She concluded that, "while [A.R.'s] phonological processing is showing marked improvement in his ability to accurately decode words when reading in isolation and connected text, his working memory, sequencing, [and] processing speed continue to present challenges for [him] in academic areas." *Id*. at 2408. She added that the results indicated that "orthographic processing is impacting

[A.R.'s] sight word development, reading fluency, written language and mathematics[,]" supporting "use of a highly structured multi-sensory approach across the curriculum[,]" including "visual imaging, kinesthetic techniques, and manipulation of concrete materials to support concept development." *Id*. Ms. Papageorge recommended that A.R. "continue to receive direct reading instruction one-one-one with a highly qualified reading specialist trained in . . . well-researched multi-sensory approaches from Lindamood[-]Bell to address both phonological and orthographic needs." *Id*. at 2410. At the due process hearing, she testified that, from her observation, Mr. Cunha qualified as a highly-qualified reading specialist. *Papageorge* at 5040.

34. The Hearing Officer presided over a due process hearing held on August 9, 10, 11, 15, and 28, 2017. *Id*. at 4363. In a decision dated November 6, 2017, he ruled that the IEPs and placements that York offered A.R. for the summer of 2015 and for fourth, fifth, and sixth grades were reasonably calculated to provide him with a FAPE in the least restrictive environment, as a result of which the Parents were not entitled to reimbursement of the cost of their unilateral placement of A.R. at Landmark commencing in fifth grade. *Id*. at 4402.

35. At hearing, Ms. Papageorge testified that the programming and public school placement that York proposed for A.R. for fifth and six grades were inappropriate because he required "an integrated program across the curriculum" of the kind provided by Landmark to remediate his severe orthographic processing issues. *Papageorge* at 4919, 4923-25. Ms. LeGolvan testified that, if A.R. had been in ELA or social studies classes at York Middle School in fifth grade, it "would have been appropriate to have some [in-class] support" for him in those classes. *LeGolvan* at 5562. She had not ever observed A.R. in mainstream classes in the fourth grade. *Id*. Ms. Peskurich testified that York's proposed fifth-grade IEP and public school placement, including teaching methodologies, were appropriate for A.R. *Peskurich* at 5737.

36.      The Parents maintained A.R. at Landmark for sixth grade (2017-18).  *Mrs. R.* at 4544.  Mrs. R. testified that, since enrolling at Landmark, A.R.'s attitude has improved, his anxiety has diminished, and his self-confidence has increased.  *Id.* at 4532.  She described him as having "found a new joy for learning and reading."  *Id.* at 4535.

37.      The Parents ask that the court enter judgment in their favor, reverse or vacate the Hearing Officer's order, determine that York denied A.R. a FAPE, and award them reimbursement of all costs associated with A.R.'s unilateral placement at Landmark and attorney fees and costs. Complaint at 12-13.

### III.  Proposed Conclusions of Law

#### A.  Impact of Supreme Court's Decision in *Endrew F.*

1.      The Parents predicate their challenge to the Hearing Officer's decision on the argument that, in *Endrew F.*, the Supreme Court set forth a new test for the substantive appropriateness of IEPs and placements, upending the standard long applied by the First Circuit. *See* Parents' Brief at 18-33; Plaintiffs' Reply Memorandum of Law ("Parents' Reply") (ECF No. 26) at 3-8.  This proves to be a faulty underpinning, dealing a fatal blow to their appeal.

2.      In *Endrew F.*, the Supreme Court addressed the "'difficult problem'" left open in *Rowley* of "'when handicapped children are receiving sufficient educational benefits to satisfy the requirements of the [IDEA].'"  *Endrew F.*, 137 S. Ct. at 993 (quoting *Rowley*, 458 U.S. at 202). The Court overturned the holding of the United States Court of Appeals for the Tenth Circuit that "a child's IEP is adequate as long as it is calculated to confer an educational benefit that is merely more than *de minimis*."  *Id.* at 997, 1000-01 (citation and internal punctuation omitted).  The Court held that, instead, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's

circumstances." *Id*. at 999. The Court cautioned, however, that "[a]ny review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id*. (emphasis in original).

3. The Court observed that, "for a child fully integrated in the regular classroom, an IEP typically should, as *Rowley* put it, be 'reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.'" *Id*. (quoting *Rowley*, 458 U.S. at 203-04). It noted that, "[i]f that is not a reasonable prospect for a child, his IEP need not aim for grade-level advancement[,] . . . [b]ut his educational program must be appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom." *Id*. at 1000 ("The goals may differ, but every child should have the chance to meet challenging objectives.").

4. The Court noted that, "[o]f course[,] this describes a general standard, not a formula[,]" but that, "whatever else can be said about it, this standard is markedly more demanding than the 'merely more than *de minimis*' test applied by the Tenth Circuit." *Id*. at 1000-01. It cautioned:

> We will not attempt to elaborate on what "appropriate" progress will look like from case to case. It is in the nature of the Act and the standard we adopt to resist such an effort: The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created. This absence of a bright-line rule, however, should not be mistaken for an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.

*Id*. at 1001 (quoting *Rowley*, 458 U.S. at 206).

5. The Parents construe *Endrew F.* to have set forth a "new test" of grade-level advancement that "applies to students with disabilities with average to high average cognitive abilities like A.R." Parents' Brief at 21. They assert that York's proposed fifth- and sixth-grade IEPs and placements in the middle school did not meet that test, and hence failed to offer A.R. a

FAPE, because they were not reasonably calculated to enable him to "meet grade-level expectations in academic and functional areas of the general education curriculum." *Id*. at 21-22 & n.4. They add that, "even under *Endrew F*.'s alternative 'appropriately ambitious' standard – for students lacking the potential to advance grade-to-grade – A.R.'s unique circumstances and solidly average cognitive potential support assessing his IEPs based on their ability to help him reach a level of reading skills at or near grade level." *Id*. at 22.

6.      The Parents contend that "the First Circuit's former standard does not track" the new *Endrew F*. standards "at all[,]" elaborating:

> Under *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 34 (1st Cir. 2012), a bright and capable student with a learning disability can (legally) be permitted to languish with skills well below grade level so long as they are deemed to have obtained a "meaningful, non-trivial benefit." *Id*. After all, "non-trivial" is just another way of saying "more than *de minimis*," the very Tenth Circuit standard that *Endrew F*. eliminated.

Parents' Reply at 5 (footnote omitted).[6]

7.      The Parents assert that, in *D.B.*, the First Circuit reasoned "that a new IEP would comply with the IDEA so long as it were similar to a prior IEP that had generated 'appreciable progress,' a phrase it defined by citing favorably to *Thompson R2-J Sch. Dist. v. Jeff P. ex rel. Luke P*., 540 F.3d 1143, 1153 (10th Cir. 2008), which expressly utilized the 'merely more than *de minimis*' standard now rejected by the Supreme Court." *Id*. at 5-6. Therefore, they reason, "[t]he First Circuit explicitly aligned itself with the now overturned Tenth Circuit standard for assessing a student's right to a FAPE, so its IDEA jurisprudence on this issue has been superseded by *Endrew F*." *Id*. at 6.

---

[6] The Parents misquote page 34 of *D.B.* The First Circuit stated: "[T]he IDEA calls for more than a trivial educational benefit, in line with the intent of Congress to establish a 'federal basic floor of meaningful, beneficial educational opportunity.' Hence, to comply with the IDEA, an IEP must be reasonably calculated to confer a meaningful educational benefit." *D.B*., 675 F.3d at 34 (quoting *Town of Burlington*, 736 F.2d at 789).

8.	Finally, the Parents contend that "*D.B.* also is inconsistent with *Endrew F.* in ruling that 'a determination as to a child's potential for learning and self-sufficiency does not have to precede a determination that the child's IEP complies with the IDEA.'" *Id.* at 5 (quoting *D.B.*, 675 F.3d at 37).

9.	Nonetheless, shortly after the completion of briefing in this case, the First Circuit disagreed with a parent's "premise that *Endrew F.* altered the standard to be applied here[,]" rejecting her argument that *Endrew F.* "raised the bar for evaluating the adequacy of the IEPs offered to disabled students, such that the case should be remanded to the district court for evaluation under the new standard." *Johnson*, 906 F.3d at 194. The First Circuit acknowledged that, in *Endrew F.*, the Supreme Court held the Tenth Circuit's "'more than *de minimis*'" standard "insufficient to satisfy the substantive requirements of the IDEA[,]" which "'demands . . . an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.'" *Id.* (quoting *Endrew F.*, 137 S. Ct. at 997, 1001).

10.	However, the First Circuit explained:

> In our view, the standard applied in this circuit comports with that dictated by *Endrew F.* This court has announced that, "to comply with the IDEA, an IEP must be reasonably calculated to confer a meaningful educational benefit," and emphasized that this requires consideration of the individual child's circumstances. . . . The district court (and the BSEA [Massachusetts Bureau of Special Education Appeals] before it) relied on this standard. . . . Given the lack of any evident discrepancy between the standard applied in this circuit (and in this case) and that announced by *Endrew F.*, we see no reason to remand the case for further evaluation.

*Johnson*, 906 F.3d at 194-95 (quoting *D.B.*, 675 F.3d at 34) (footnote omitted).

11.	At oral argument, the Parents' attorney continued to press the argument that the *Endrew F.* standards supersede those enunciated by the First Circuit. He noted that it was not clear whether the parties in *Johnson* raised any issue concerning the need to take into account a child's

potential for learning or self-sufficiency before assessing his or her IEP. He asserted that, in any event, this court's duty is to apply the law as construed by the Supreme Court.

12.     I am unpersuaded that the First Circuit erred in characterizing as consistent with *Endrew F.* its approach to the question of whether an IEP confers a FAPE.

13.     First, as York argues, *see* York's Response at 21-23, the Supreme Court did not create two substantive standards hinging on whether a child has the cognitive potential to achieve at grade level. To the contrary, the Court emphasized that it would "not attempt to elaborate on what 'appropriate' progress w[ould] look like from case to case[,]" that "[t]he adequacy of a given IEP turns on the unique circumstances of the child for whom it was created[,]" and that the "absence of a bright-line rule . . . should not be mistaken for 'an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" *Endrew F.*, 137 S. Ct. at 1001 (quoting *Rowley*, 458 U.S. at 206).

14.     Second, as York's attorney noted at oral argument, in *D.B.*, the First Circuit did not cite *Thompson* for the proposition that an IEP must be calculated merely to confer a more than *de minimis* benefit. Rather, the First Circuit cited *Thompson* for the proposition that, "if a child's potential is unknowable, his or her IEP still could be reasonably calculated to confer a *meaningful educational benefit* if it is closely modeled on a previous IEP pursuant to which the child made appreciable progress." *D.B.*, 675 F.3d at 37-38 (emphasis added). This approach harmonizes with the standard articulated in *Endrew F.*: that "an educational program [must be] reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 1001. Indeed, in *Endrew F.*, the Supreme Court declined the parents' invitation to define a FAPE as "an education that aims to provide a child with a disability opportunities to achieve academic success, attain self-sufficiency, and contribute to society that

are substantially equal to the opportunities afforded children without disabilities." *Endrew F*., 137 S. Ct. at 1001 (citation and internal quotation marks omitted).

15.     Finally, while, in *D.B*., the First Circuit agreed "with the district court that a determination as to a child's potential for learning and self-sufficiency does not have to precede a determination that the child's IEP complies with the IDEA[,]" it did so in circumstances in which the district court had found as a factual matter that the child's potential for learning was unknowable.  *D.B*., 675 F.3d at 37.  In that context, the First Circuit noted that it had previously endorsed the proposition that "levels of progress must be judged with respect to the potential of the particular child," reaffirming that, "[i]n most cases, an assessment of a child's potential will be a useful tool for evaluating the adequacy of his or her IEP."  *Id*. at 36 (citation and internal quotation marks omitted).  I do not construe *Endrew F*. to foreclose a finding that a disabled child's IEP confers a FAPE in circumstances in which his or her potential for learning is unknowable.  *See Endrew F*., 137 S. Ct. at 999 ("To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.").

16.     Because the Parents predicate their challenge to the Hearing Officer's findings that York's fifth- and sixth-grade IEP and placement offers were reasonably calculated to confer a FAPE on their unpersuasive argument that *Endrew F*. sets forth new substantive FAPE standards that upend those of the First Circuit, their appeal must be denied.

### B.  Challenge to Hearing Officer's Findings

17.     In any event, and while it is unnecessary to reach this point, I conclude that the Parents' challenge to the Hearing Officer's application of *Endrew F*. to the facts of this case also founders.

18.     The Parents fault the Hearing Officer for (i) improperly rejecting the application of *Endrew F.*'s grade-level advancement standard to A.R., (ii) seemingly contradictorily finding that, despite A.R.'s inability to advance at grade level, he could be placed in two large mainstream classes with heavy reading and writing demands (ELA and social studies) without adult support, (iii) mischaracterizing York's fifth-grade IEP offer as amended in November 2016, and (iv) ignoring other assertedly inappropriate aspects of York's fifth-grade offer. *See* Parents' Brief at 23-31. They argue that the Hearing Officer further erred in failing to analyze or address York's sixth-grade IEP and placement offers, which were similarly flawed. *See id.* at 31-33.

19.     The Hearing Officer correctly concluded, and I independently find, that A.R. "was not 'fully integrated' into the mainstream classroom" and that "grade-level advancement [was not] a reasonable prospect at any of the applicable time periods at issue in this case." R. at 4391. As the Hearing Officer observed, the Parents themselves noted that A.R. had "deficits in processing and working memory that 'significantly impact [his] development of basic reading skills' and required intensive 1:1 specially designed instruction in reading." *Id.* at 4392 n.10 (quoting R. at 4233-34)). Indeed, although A.R. made significant progress with the benefit of intensive 1:1 reading and writing remediation programs in third grade, which the Parents did not challenge below, and fourth grade, which they do not challenge on appeal to this court, he remained a full grade level behind his peers in reading as of the end of fourth grade, *see* R. at 483, and a grade-and-a-half behind his peers at the conclusion of fifth grade at Landmark, *see Pulkkinen* at 4813-14. He, thus, was not yet performing at grade level in reading and writing at any relevant time.

20.     The Hearing Officer also correctly concluded, and I independently find, that York's IEP and placement offers for fifth and sixth grades were reasonably calculated to enable A.R. to

make progress appropriate to his circumstances, providing him with a FAPE. *See* R. at 4390, 4392-93.

21.     The Hearing Officer rejected the Parents' argument that A.R.'s fifth-grade placement in the literacy-heavy ELA and social studies classes was inappropriate in that, (i) apart from requiring adult support to assist with language-based mathematics instruction, A.R. had been able to access mainstream math, science, and social studies classes in fourth grade with his specially designed instructional supports, and "Ms. Frazier offered credible evidence that as a regular education intervention, the fifth-grade classes had additional education technicians that were available to provide support[,] and these adults would have been available to the Student[.]" *Id.* at 4399.

22.     The Parents complain that the Hearing Officer's reliance on A.R.'s fourth-grade experience was misplaced because A.R. had never previously accessed mainstream ELA classes and because the literacy demands of social studies intensify in fifth grade. *See* Parents' Brief at 26.  They assert that his reliance on Ms. Frazier's testimony was misplaced because the IEP is silent about providing any such services, and reliance on "retrospective testimony" to amend an IEP is improper. *See id.* at 26-27.

23.     As York counters, *see* York's Response at 28, Ms. Frazier's testimony that educational technicians generally were available to assist students at the middle school did not amount to a retrospective amendment of the IEP.  Ms. Frazier acknowledged that the IEP did not provide for 1:1 in-class adult support for A.R.  *See Frazier* at 5859.  However, she observed that educational technicians were assigned to provide support for middle school teams, and there was "frequently an additional adult available." *Id.*  York correctly notes that the provision of services generally available in a classroom is not an "accommodation" for purposes of the IDEA.  *See*

York's Response at 28; Maine Unified Special Education Regulation, Code Me. R. 05-071 ch. 101 (2017) ("MUSER"), § II(2) (defining "accommodations," in relevant part, as "changes in the manner in which instruction and assessment is delivered"). The Hearing Officer, hence, properly took that testimony into consideration.

24.     Moreover, as York's attorney noted at oral argument, the IEP team added a new and significant accommodation commencing in fifth grade in the form of "speech to text and text to speech" technology. R. at 2753, 2766. While, as a philosophical matter, Landmark opposes the use of such "bypass techniques[,]" *id.* at 2315, the Parents have not shown that this technology would have been ineffective in enabling A.R. to access mainstream content commensurate with his cognitive potential.

25.     Finally, while, as the Parents note, *see* Parents' Brief at 25, Ms. LeGolvan indicated at hearing that A.R. required his own educational technician to access mainstream ELA and social studies classes, she had not observed him in mainstream classes, *see* R. at 5562, and neither Dr. Cook nor Ms. Papageorge recommended the provision of 1:1 adult support in such classes, *see* R. at 929 (provision of educational technician not among Dr. Cook's five recommended accommodations), 455-56 (provision of educational technician not among recommendations by Ms. Papageorge following May 2016 reevaluation).

26.     The Parents next correctly note that the Hearing Officer mischaracterized A.R.'s fifth-grade IEP as amended on November 17, 2016, as continuing to provide for 450 minutes of literacy instruction when, in fact, that level was cut in half. *See* Parents' Brief at 28; Finding 58, R. at 4381. As York rejoins, *see* York's Response at 30, the error is harmless. The Parents represent that their decision to place A.R. at Landmark was made based on York's June 2016 IEP offer, *see* Parents' Brief at 24, and Mrs. R. made clear that they had no intention of pulling A.R.

out of Landmark as of November 2016, *see Mrs. R.* at 4623. The error does not impact the Parents' consideration of York's sixth-grade offer: in April 2017, prior to the end of A.R.'s fifth-grade year, York amended his IEP to restore the higher level of minutes of specialized literacy instruction, *see* R. at 2827-28.

27. The Parents finally fault the Hearing Officer for "never adequately explor[ing]" other assertedly inappropriate aspects of York's fifth-grade offer, namely, (i) his proposed exclusion from science class, (ii) the IEP's silence about the specific specialized literacy programming he was to receive to address his dual-deficit dyslexia, (iii) his proposed receipt of remedial literacy instruction in the afternoon, although his prior case manager and evaluators had recommended that he receive such services early in the day, when he was fresh, (iv) Ms. LeGolvan's purported lack of training and experience to provide the LiPS/Seeing Stars programs for A.R. in fifth grade, and (v) York's inherent inability to offer the placement that A.R. required, namely, one "capable of integrating his specialized literacy instruction in all courses across the curriculum to reinforce skills and foster retention," with "small class sizes across his day[.]" Parents' Brief at 28-31.

28. These final challenges prove unavailing. Although the Hearing Officer did not address the first point, *see* R. at 4395-4401, it is without merit. York recommended that A.R. forgo some combination of science and allied arts to receive his specialized 1:1 instruction, rather than ELA and social studies, because it felt it was in his best interest to do so. *See id.* at 2780 (June 17, 2016, email from Ms. LeGolvan to the Parents explaining that it did not "seem like a good choice to pull from English and/or Social Studies since they are integrated and will include York History field trips in which all 5th graders participate"), 2787 (July 8, 2016, email from York Middle School Principal Barbara Maling to Ms. LeGolvan explaining that, despite Mrs. R.'s misgivings,

Ms. Maling preferred to "start with the ELA/SS block and see how it goes" because she was "nervous about taking a student with a reading disability out of a rich ELA environment"). As York's attorney noted at oral argument, these are precisely the kinds of educational judgments to which deference is due. *See, e.g., Endrew F.,* 137 S. Ct. at 1001 (review of adequacy of IEP is not "'an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities'") (quoting *Rowley,* 458 U.S. at 206); *Mr. & Mrs. I v. Me. Sch. Admin. Dist. 55,* 416 F. Supp.2d 147, 156 (D. Me. 2006), *aff'd,* 480 F.3d 1 (1st Cir. 2007) ("Where the issue is one that implicates the educational expertise of the school district, more deference is due the administrative findings.").

29.     On the second point, the Hearing Officer found no fault with York's decision to begin excluding references to specific literacy methodologies from A.R.'s IEPs beginning in the fourth grade, noting that the Parents' "argument that the LiPS and Seeing Stars methodologies [we]re essential to [A.R.'s] educational programming [wa]s contradicted" by their assertion that A.R. had "shown a 'marked improvement' in his confidence and ability to perform academic tasks" at Landmark, which did not use the Seeing Stars program with him and used materials from the LiPS program with less frequency on a 1:1 basis than had been provided by York. R. at 4397 & n.14. As York argues, *see* York's Response at 19-20, because the Parents have not challenged the Hearing Officer's finding that A.R.'s fourth-grade IEP and placement conferred a FAPE, they are collaterally estopped from relitigating that point, *see, e.g., Pollack ex rel. B.P. v. Reg'l Sch. Unit 75*, 886 F.3d 75, 85 (1st Cir. 2018) ("[I]ssue preclusion applies not only to determinations of law, such as whether the IDEA . . . has been violated, but also to determinations of fact made in resolving issues of law.").

30. Although the Hearing Officer did not address the third point, *see* R. at 4395-4401, it, too, is without merit. The timing of the scheduling of A.R.'s 1:1 specialized instruction is, again, a matter within the province of educators' expertise to which deference is due. *See, e.g., Endrew F.*, 137 S. Ct. at 1001; *Mr. & Mrs. I*, 416 F. Supp.2d at 156.

31. On the fourth point, the Hearing Officer concluded, *see* R. at 4398-99, and I independently find, that Ms. LeGolvan was qualified to deliver A.R.'s specially designed instruction. Ms. LeGolvan has been teaching special education for more than 30 years, holds two master's degrees in education, is both a certified special education teacher and a certified literacy consultant in Maine, and, as of August 2016, was trained in LiPS and experienced in Precision Teaching, *see LeGolvan* at 5519-24, 5535.

32. The Hearing Officer acknowledged that Ms. Papageorge's testimony supported a finding that York staff, including Ms. LeGolvan, were not qualified to provide A.R.'s Seeing Stars program. *See id*. at 4398-99 (noting that Ms. Papageorge had recommended that a "'highly qualified'" person provide A.R.'s literacy program and that such a person would not only have needed to attend the Seeing Stars workshop but also spent at least a year implementing the Seeing Stars program) (quoting *Papageorge* at 5039-40); *see also id*. at 5020-21. However, he deemed her testimony "confusing and contradictory[,]" given that she had also testified that Mr. Cunha, who was providing A.R.'s 1:1 literacy instruction at Landmark, was "'highly qualified'" although he lacked a degree or any educational background in reading instruction, had just received a six-month waiver for a special education certification, and had not yet been trained in Seeing Stars. *Id*. at 4399 (quoting *Papageorge* at 5040); *see also Pulkkinen* at 4797-4801. I defer to this facially reasonable resolution of conflicts in the testimony.

33. On the fifth point, the Hearing Officer properly rejected the Parents' assertion that A.R. required a more restrictive placement, noting that even Dr. Cook, whose October 2015 report highlighted A.R.'s significant challenges, recommended a combination of mainstream and pullout instruction in public school, *see* R. at 928, 4400, and that the evidence supported a finding that A.R. was not making better progress in reading at Landmark than he had in the York public schools, *see id*. at 4400-01; *Pulkkinen* at 4813-15 (A.R. was working at mid-third grade level at the end of fifth grade at Landmark, and his rate of progress at Landmark was "uneven at best").

34. The Parents, finally, fault the Hearing Officer for failing even to purport to analyze or address the sixth-grade IEP and placement that York proposed for A.R. in June 2017. *See* Parents' Brief at 32. They assert that this IEP and placement offer carried over most of the flaws of the prior one: lack of specification of the literacy program to be delivered, lack of the provision of a 1:1 educational technician in large, mainstream classes, failure to ensure the integration of A.R.'s instruction across the curriculum (essentially, the Landmark model), the provision of specially designed instruction too late in the day, when A.R. was not as fresh, and lack of evidence that York had either a consultant or teachers qualified to deliver the Lindamood-Bell programming that he required. *See id*. at 32-33.

35. The Hearing Officer did address the Parents' objection to the sixth-grade IEP on the basis of lack of specification of the literacy programs, rejecting it for the same reasons as the identical argument as to the fifth-grade IEP. *See* R. at 4401. While he did not address the remaining points as to the sixth-grade offer, *see id*., they founder for the same reasons discussed above.[7]

---

[7] In addition, to the extent that the Parents argue that York presented no evidence that it had a consultant or teachers qualified to deliver A.R.'s literacy programming in sixth grade, *see* Parents' Brief at 33, York correctly notes that it did present such evidence, *see* York's Response at 32; R. at 2881, 2888; *Frazier* at 5836-37, 5868-69.

## IV.  Conclusion

For the foregoing reasons, I recommend that the Parents' request for relief be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 24th day of May, 2019.


/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge